# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RENE ARTURO LOPEZ, AQUILLA A. D. TURNER, MOHAMMED BARAKATULLAH ABDUSSALAAM, & BAYENAH NUR | ) ) ) | CASE NO: 1:10-cv-00023 (PLF) |
| Addresses: Lopez & Turner: 1025 S. Hoga Rd., Sterling, VA 21064; Abdussalaam: 1705 Rivermont Ave., Lynchburg, VA 24503; Nur: 165-2 Piedmont Pointe, Mooresville, NC 28115 | ) ) ) ) ) | ALLEGING: FRAUD DC CONSUMER PROT PROC ACT VA CONSUMER PROT ACT BREACH OF FIDUCIARY DUTIES INFL OF EMOTIONAL DISTRESS |
| *Plaintiffs*, -*v.*- | ) ) ) ) | |
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS ACTION NETWORK, INC. | ) ) ) | |
| Known Address: 453 New Jersey Ave SE, Wash., DC 20003 | ) ) ) | |
| *Defendant*. | ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs, by their attorneys, allege on information and belief based, *inter alia*, on the investigation of their legal counsel, except as to those allegations which pertain to the plaintiffs, which are based upon personal knowledge and belief, as follows:

## NATURE OF THE ACTION

1.       This is a diversity action alleging fraud, breach of fiduciary duty, intentional infliction of emotional distress, and violations of the District of

Columbia Consumer Protection Procedures Act ("DCCPPA") and the Virginia

Consumer Protection Act ("VCPA") on behalf of Plaintiffs who sought legal

representation from Defendant Council on American-Islamic Relations Action

Network, Inc., formerly known as Council on American-Islamic Relations, Inc.

("CAIR"). CAIR represents itself to the public as a public interest law firm

representing Muslim Americans in matters relating to civil rights violations,

employment discrimination, and immigration issues. In fact, CAIR is not a law

firm and it does not provide licensed legal services to its clientele. Rather, CAIR

uses the veneer of a Muslim civil rights organization to carry out its principle

purposes as a criminal organization. Specifically, CAIR has been identified in

several federal prosecutions as a co-conspirator in the financing and support of

international terrorism (i.e., jihad) operating as a covert front group for Hamas

and the Muslim Brotherhood, organizations with a long history of terrorism

through jihad.

  2. Plaintiffs contacted CAIR through its Herndon, Virginia branch

office ("CAIR-VA") from February 2007 through September 2008. Plaintiffs

allege that CAIR, through its officers, directors, and executives, engaged in

common law fraud and state statutory fraud, thereby damaging Plaintiff. These

fraudulent acts also amounted to breach of fiduciary duty and intentional

infliction of emotional distress, further damaging Plaintiffs.

  3. This action arises out of a scheme by CAIR, a criminal organization

which fraudulently purports to be a national public interest law firm, to conceal

a wide-reaching fraud conducted by and through CAIR-VA, a CAIR branch office in Herndon, Virginia. Upon information and belief, CAIR opened up its CAIR-VA office sometime in December 2004.

4.      In or about in June 2006, CAIR-VA employed Morris J. Days III ("Days") as its "resident attorney" and "manager" of its civil rights department to provide legal representation to Muslims complaining of various civil rights abuses.

5.      Days was not and never has been an attorney. CAIR knew or should have known that Days was committing fraud by holding himself out as a CAIR attorney. CAIR knew or should have known that it was committing fraud by representing to the public, including Plaintiffs, that Days was a licensed attorney.

6.      CAIR also knew, at least by November 2007 that Days fraudulently obtained money from CAIR clients for CAIR's legal representation notwithstanding CAIR's stated policy to provide *pro bono* legal services to the public and CAIR also knew or had reason to know that CAIR and Days were fraudulently representing to the public that CAIR and Days were providing legal services to their clients. Subsequent to this time and for months thereafter, CAIR made absolutely no attempt (1) to contact its clients, including Plaintiffs, to inform them of this fraudulent conduct; (2) to make restitution to its clients for these fraudulent legal fees; or (3) to make any effort to investigate the legal matters CAIR-VA was conducting for its clients to determine what remedial

steps, if any, needed to be undertaken. Further, CAIR made no effort to contact any government authorities regarding Days' fraudulent conduct, thereby further ratifying the scheme.

7.    After many complaints and threats of litigation by CAIR clients charging inadequate representation, CAIR finally terminated Days' employment in February 2008. At all relevant times, CAIR knew or should have known that Days had never been to law school and was not an attorney. By November 2007, CAIR knew or should have known that Days had criminally defrauded at least 30 clients by taking funds on behalf of CAIR under false pretenses. Further, CAIR knew that Days had represented over 100 CAIR clients as CAIR's "resident attorney" even though he was not licensed to practice law.

8.    Upon discovering Days' fraudulent actions, CAIR made no effort to contact any government agencies to report the criminal fraud, nor did CAIR make any effort to contact its clients to inform them of the fact that Days was not a licensed attorney. CAIR made no effort to inform their clients orally or in writing that they should seek independent legal counsel to ascertain if they had viable claims against CAIR and/or Days nor did CAIR attempt to provide restitution to their clients. Instead, CAIR and its employees, officers, and directors conspired to defraud their clients by telling them that Days was never an employee of CAIR, that he was acting on his own or as an "independent contractor", and that they (i.e., the defrauded clients) should seek redress from Days himself.

9.    CAIR and its employees knew that the representations set forth above were false insofar as CAIR's publicity and representations about Days was intended to and did in fact establish in the minds of both the general public and Plaintiffs that CAIR was a legally authorized PILF and Days was an employee and/or agent of CAIR acting in his capacity as both a "resident" CAIR attorney and the "Civil Rights Manager" of CAIR-VA. Days in fact acted as an employee of CAIR-VA. CAIR intended that Plaintiff would in fact rely upon these false representations.

### JURISDICTION AND VENUE

10.    This Court has federal subject matter jurisdiction of the state law claims alleged herein pursuant to 28 U.S.C. § 1332 in that this action is between parties who are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) (1)-(2) in that the sole defendant, CAIR, is a corporate entity formed and doing business in the District of Columbia.

12.    This Court has personal jurisdiction over the Defendant CAIR pursuant to, *inter alia*, D.C. Code § 13-422 in that CAIR is organized under the laws of, and maintains its principle place of business in, the District of Columbia.

## PARTIES

13.     Defendant CAIR has at all relevant times been a not-for-profit company formed and conducting its affairs principally in the District of Columbia.

14.     Plaintiffs Rene Arturo Lopez ("Lopez"), Aquilla A. D. Turner ("Turner"), Mohammed Barakatullah Abdussalaam ("MB"), and Bayenah Nur ("Nur") have been at all relevant times citizens of Virginia (with the exception of Nur who moved to North Carolina and currently resides there) who retained CAIR and Days to represent their respective interests in legal matters relating to immigration status, divorce proceedings, hostile work environment, and employment discrimination, respectively.

## FACTUAL BASIS FOR CLAIMS

### Fraud and Conspiracy to Commit Fraud

15.     CAIR represents itself to the public and purports to operate as a public interest law firm (hereafter "PILF"), providing *pro bono* legal services nationally through regional and local branch offices (collectively referred to as "CAIR"). It purports to advocate and litigate on behalf of Muslims in the U.S. to protect their civil liberties.

16.     Days was initially employed by CAIR-VA in June 2006.  CAIR-VA was a subsidiary or entity controlled by CAIR and/or acted as CAIR's alter ego.

17.     Beginning at least in or about March 2007, CAIR promoted Days to the public through various publications distributed through the United States

Postal Service (hereafter "USPS") and through CAIR's web site as a well-respected and publicly honored "resident attorney," and as the "manager" of the CAIR-VA "civil rights department." (Attached hereto as Exhibit I is a true and correct copy of one such publication distributed to the public through the USPS in or about March – May 2007 by CAIR-VA; attached hereto as Exhibit II are true and correct copies of two articles published on the CAIR website posted in or about December 2007 and remaining on the CAIR website until at least September 2, 2008.)

18.     At all relevant times, CAIR knew or should have known by the exercise of ordinary due diligence that Days was not actually a lawyer and that CAIR was perpetrating a massive fraud on the readers of its website and promotional materials.

19.     Beginning in June 2006, Days worked at the CAIR-VA office, conducted client intake for CAIR-VA to provide legal representation as a licensed attorney to the aggrieved members of the public, entered into agreements to represent clients on behalf of CAIR as a CAIR attorney, and corresponded by use of the USPS and interstate facsimile transmissions and by telephone utilizing interstate wires with a variety of government agencies, private corporations, and individuals as a CAIR attorney on behalf of CAIR clients utilizing CAIR-VA stationery and identifying himself as a CAIR attorney.

20.    According to CAIR's public representations, Days, as an attorney employed by CAIR, represented well over 100 individual clients on behalf of CAIR.

21.    Days, however, was not and is not a lawyer. He never attended law school nor was he licensed as an attorney to practice law in any jurisdiction in the United States. CAIR knew or should have known that Days was not a lawyer when it hired him. The unauthorized practice of law is a criminal offense in the Commonwealth of Virginia.

22.    In addition, Days charged money for the CAIR legal services rendered by him and CAIR-VA staff from no less than 30 CAIR clients. CAIR had actual and constructive knowledge of this fraudulent conduct by no later than November 2007.

23.    Days knowingly, willfully, and with the specific intent to defraud CAIR clients, represented that he was a competent, licensed attorney.

24.    CAIR knowingly and with the specific intent to defraud CAIR clients, or with a reckless disregard of the truth, represented that Days was a competent, licensed attorney employed by CAIR to provide these legal services.

25.    The clients who retained CAIR and Days to represent them as legal counsel, including Plaintiff, reasonably and justifiably relied upon CAIR and Days' public representations that CAIR and Days would competently represent them in their legal matters.

26.     At all relevant times, Khalid Iqbal ("Iqbal") was an official, authorized representative, and managing director of CAIR-VA and Defendant CAIR. At all relevant times, Iqbal worked out of the CAIR-VA office and was Days' superior. Iqbal in turn reported to his superiors at CAIR in the D.C. offices and his actions as the authorized representative of CAIR-VA were controlled by CAIR.

27.     Iqbal knew or should have known that Days was not a licensed attorney when he hired him. Iqbal knew in fact that Days illegally collected attorneys' fees and legal costs from CAIR clients in violation of CAIR's policy to represent its clients *pro bono* at least by November 2007. Neither Iqbal nor CAIR made any effort at that time or in the months following this discovery to inform CAIR clients that they had been defrauded into retaining CAIR to represent them insofar as CAIR did not employ a licensed attorney.

28.     After learning of the financial fraud, Iqbal and CAIR immediately entered into a conspiracy with Days to have Days continue to act as an attorney representing CAIR clients and to take affirmative steps to cover-up the fraud even though Iqbal and CAIR knew of Days' fraudulent conduct in charging legal fees and they also knew or should have known that Days was not a licensed attorney.

29.     At this time, CAIR-VA intentionally, recklessly, and/or negligently continued to employ Days and CAIR and CAIR-VA intentionally, recklessly,

and/or negligently continued to represent to the public and to the Plaintiff that Days was a competent, professional, and accomplished attorney.

30.     CAIR-VA did not terminate Days' employment until February 10, 2008.

31.     Throughout Days' employment at CAIR-VA, Iqbal and other employees of CAIR-VA had received many complaints from CAIR clients about Days' malfeasance and performance in handling their respective cases. By November 2007, the complaints increased and CAIR had substantial and overwhelming evidence that Days was not a lawyer and that he had taken legal fees from CAIR clients during his employment as a CAIR attorney and had performed no legal services or had inadequately represented their interests

32.     At all relevant times, Nihad Awad aka Nihad Hammad ("Awad") was an employee and the executive director of CAIR. At all relevant times, Parvez Ahmed ("Ahmed") was the chairman of the board of CAIR. At all relevant times, Tahra Goraya ("Goraya") was an employee and the national director of CAIR. At all relevant times, Khadijah Athman ("Athman") was an employee and the manager of the "civil rights" division of CAIR. At all relevant times, Nadhira al-Khalili ("Al-Khalili") was an employee and in-house legal counsel for CAIR. At all relevant times, defendant Ibrahim Hooper ("Hooper") was an employee and the director of communications of CAIR. At all relevant times, Amina Rubin ("Rubin") was an employee and coordinator of communications of CAIR.

Defendants Iqbal, Awad, Goraya, Athman, Al-Khalili, Hooper, and Rubin shall be referred to collectively as "CAIR Management".

33.     Various defrauded clients of CAIR-VA informed CAIR Management in November and December 2007 of the fraudulent conduct of Days and CAIR-VA. On each occasion and pursuant to the conspiracy entered into between Days and CAIR, CAIR Management failed to inform the complaining clients that Days was not a lawyer and that he had obtained legal fees and costs fraudulently.

34.     By several interstate emails and telephone calls from CAIR-VA to CAIR, and in furtherance of the fraud and conspiracy to commit fraud as set forth above, on February 8, 2008 and continuing for several weeks thereafter Iqbal informed Ahmed, Awad, Goraya, and other officials of CAIR that some CAIR clients were now threatening legal action against CAIR arising out of the fraud perpetrated by Days and CAIR. Iqbal also asked CAIR for instructions on how to proceed. Ahmed, Awad, Goraya and/or other officials of CAIR informed Athman and Al-Khalili of these developments soon thereafter.

35.     Between February 8 and 10, 2008, Iqbal, Ahmed, Awad, Goraya, Athman, and Al-Khalili agreed to terminate Days' employment and to take additional steps to further the fraud conspiracy. Specifically, CAIR Management took affirmative steps to conceal the fraud from their clients, including Plaintiff, by failing to inform them of the facts and to make false representations to the victims to lull them into a false sense of security about the status of their

pending legal matters and not to report CAIR's fraud to state or federal authorities or to the media.

36.     Accordingly, CAIR Management agreed to mislead the victims, including Plaintiff, of the fraud perpetrated by Days and CAIR by simply telling them that Days was never actually employed by CAIR but rather worked as an independent contractor and that any complaints they might have they must take up with Days.

37.     Thus, during the months February through September 2008, CAIR Management further conspired to advance the fraud by knowingly concealing and misrepresenting material facts from its clients with the specific intent that these clients, including Plaintiff, would reasonably rely on these misrepresentations and omissions of material fact to their detriment. Specifically, CAIR Management knew that Days was in fact an employee of CAIR, that during his employment he was not an attorney, and that he had failed to handle the legal matters entrusted to him. Notwithstanding this knowledge, CAIR Management fraudulently informed the CAIR victims, including Plaintiff, that Days was never an employee of CAIR or CAIR-VA; rather that he was an independent contractor of CAIR and as such the victims, including Plaintiff, had to take up their complaints with Days. CAIR Management also fraudulently represented to the CAIR victims, including Plaintiff, that Days was an attorney during his employment with CAIR.

38.     Upon information and belief, during this time period, as the complaints mounted over time, CAIR Management further agreed (a) to ignore the least vocal and threatening CAIR victims-clients; (b) to tell the more vocal and persistent CAIR victims-clients (seeking some responsible and professional legal representation or recompense) only that Days was "no longer at the CAIR-VA office" and that their only recourse was to contact Days; (c) to appease the most adamant and threatening CAIR victims-clients with partial restitution of their legal fees; and (d) not to disclose the criminal fraud of its CAIR clients to any law enforcement or other government agency.

39.     As set forth above, CAIR Management agreed to pay restitution to the most vocal, angry, and threatening CAIR clients-victims for their actual out-of-pocket expenses incurred in paying legal fees but demanded that the CAIR clients-victims execute a document titled "Voluntary Agreement and Release of Claims" (hereinafter the "Release of Claims Document"). A true and correct copy of the form of the Release of Claims Document is attached hereto as Exhibit III and incorporated herein by this reference. The Release of Claims Document purports to release CAIR from any and all liability arising out of its prior or future representation of former or current clients.

40.     Upon information and belief, various former or current clients who received some amount of restitution from CAIR signed the Release of Claims Document (the "Settling Clients").

41.     Upon information and belief, at no time did CAIR advise the Settling Clients in writing in advance of entering into the Release of Claims Document that they should seek independent legal counsel or that CAIR and its attorneys were in an adversarial position to the Settling Clients.

42.     The Release of Claims Document purports to impose a duty on the Settling Clients not to disclose to any third party the content of the Release of Claims Document or the events relating to the above-described criminal fraud which led to the signing of the Release of Claims Document (the "Silence Clause"). The Silence Clause on its face prohibits the Settling Clients from disclosing the criminal fraud to law enforcement personnel and even to their own retained independent legal counsel if retained subsequent to signing the Release of Claims Document.

43.     The Silence Clause is unlike almost all typical confidentiality provisions in settlement agreements. First, the Silence Clause relates not to a typical contract or tort claim affecting only the private, civil interests of the parties at loggerheads but to the criminal fraud arising out of a fiduciary relationship between Days, CAIR, and the client/victims, including Plaintiff.

44.     Second, the Silence Clause provides no exceptions for responding to governmental or court-authorized legal inquiries or in the event the information subject to the Silence Clause is otherwise made public by a third party.

45.     Third, the Silence Clause is imposed by CAIR in an adversarial setting on former and current clients-victims to which CAIR had a fiduciary duty.

46.     Fourth, CAIR knew that many of its aggrieved Settling Clients were in desperate situations and that they were in manifestly unequal bargaining positions and, upon information and belief, unrepresented by independent legal counsel.

47.     Fifth, the Silence Clause is a classic case of overreaching by a fiduciary in a position to take advantage of a lesser informed client in that the Silence Clause is part of an agreement that purports to release CAIR as a PILF for future claims of breach of contract, malpractice, or breach of fiduciary duty arising out of the subject matter of the Release of Claims Document.

48.     And sixth, the Silence Clause effectively prevents the Settling Clients from disclosing this matter publicly and thereby triggering the discovery of the full breadth of the criminal fraud to the CAIR clients victimized and silently suffering the consequences because they have relied on CAIR's false representations that their only recourse was to track down "attorney" Days and seek relief from him.

49.     The Release of Claims Document further states that the Settling Clients agree that if the Settling Clients breach the Silence Clause, CAIR will be entitled to "Damages in the amount of $25,000.00" (the "Liquidated Damages Clause"). The Liquidated Damages Clause was inserted by CAIR to concretize

the fear and intimidation experienced by the Settling Clients so that they would not expose the criminal fraud publicly all in an effort to conceal the fraud from other CAIR clients-victims, including Plaintiff.

50.     The Silence Clause is Draconian and unconscionable in its scope and in its intended effect to frighten and intimidate the Settling Clients-victims who were not represented by independent legal counsel.

51.     CAIR decided to close down CAIR-VA to further the cover-up of the criminal fraud.

52.     On or about June 2, 2008, just prior to the final closing of the CAIR-VA offices, Al-Khalili, who acts as CAIR's "national legal counsel", came to the offices at CAIR-VA, met with Iqbal and discussed with Iqbal and other CAIR-VA personnel various legal matters relating to CAIR clients and specifically about the criminal fraud. Al-Khalili then had various files and computer discs, including the legal files of the CAIR clients-victims and other evidence and documents relating to the criminal fraud loaded into her car and drove off with them in order to further the fraudulent conspiracy.

53.     At all relevant times, CAIR neither continued to represent the CAIR clients-victims (or to obtain legal counsel for them), nor returned their legal files to them, all in further of the conspiracy to commit fraud.

**PLAINTIFFS WERE VICTIMIZED BY THE CRIMINAL FRAUD AND CONSPIRACY**

54.     Plaintiffs Turner, Lopez, MB, and Nur came to CAIR-VA for legal representation by CAIR relating to divorce proceedings, immigration status,

hostile work environment, and employment discrimination, respectively. Turner, Lopez, MB, and Nur reasonably and justifiably relied upon the fraudulent conduct set forth herein.

### Plaintiff MB

55.     MB first contacted Days by telephone in February 2007 to ask that CAIR represent him in a pending administrative proceeding before the federal Equal Employment Opportunity Commission ("EEOC") relating to employment discrimination MB suffered during his employment by the City of Lynchburg. The employment discrimination suffered by MB was wrongful and in violation of state and federal law.

56.     At the time, MB was 22 years old. In these conversations Days persuaded MB that he and CAIR were competent to act as his lawyer and induced MB to pay CAIR for these legal services.  MB then paid Days through a wire transfer using a Western Union facility.

57.     MB spoke to Days numerous times by telephone during the pendency of the EEOC claim. In March, in furtherance of the fraudulent conduct described herein, Days sent a letter on CAIR-VA stationery by fax to the City of Lynchburg, Virginia, office of the Department of Utilities indicating that he was following up on the complaint filed by MB of employment harassment. On March 27, 2007, Timothy A. Mitchell, Director of the Department of Utilities of the City of Lynchburg sent a letter back to Days via USPS acknowledging Days' letter and that he was aware of MB's complaint with the EEOC.

58.    During this time, in an apparent effort to assure MB of CAIR's and Days' legal professional competency, Days showed MB brochures such as Exhibit I. Plaintiff continued to reasonably rely on these representations of professional competency.

59.    In or about in late April or early May 2007, MB met with Days in an Arlington, Virginia hotel where Days was attending a CAIR meeting with CAIR employees. MB gave Days all of the documents and evidence underlying his claims of employment discrimination.

60.    In mid-May 2007, MB received notice from the EEOC that it was not pursuing his claim and that he had a "right to sue" within 90 days. MB informed Days of the Right-to-Sue letter. After several more telephone calls from MB to Days, Days arranged that MB would meet Days at the Richmond, Virginia train station on or about July 10, 2007. MB drove Days around to several locations including the U.S. District Court. MB would wait in his car while Days conducted his business at the various locations. Days provided MB with what purported to be a summons for a federal lawsuit against the City of Lynchburg, his employer, against which he had a grievance. Days informed MB that CAIR required $350 to file the lawsuit. MB informed Days that he had only $250. Days responded, "No problem; don't worry about the $100; I'll put it in and when you win hook me up." MB had understood that to mean that MB would pay Days part of any judgment.

61.     Days incorrectly informed MB that the City of Lynchburg would have only ten days to respond to the lawsuit.

62.     In fact, neither CAIR nor Days filed any such lawsuit.

63.     On or about July 27, 2007, the City of Lynchburg terminated MB's employment in retaliation for filing his claim for discrimination with the EEOC. In August, MB filed a new claim with the EEOC for retaliatory termination.

64.     In or about mid-December 2007, MB called CAIR-VA to speak to Days about the status of his federal litigation and his new EEOC claim. Iqbal answered the telephone and, pursuant to the conspiracy to conceal the fraudulent conduct described herein, informed MB that he knew nothing of these matters but would look into them and telephone MB in a few days. MB heard nothing from Iqbal and called CAIR-VA back in a few days. He spoke to Iqbal. During that telephone conversation he explained to Iqbal that he had paid Days money to file his federal lawsuit and he expected to know the status of the litigation. Iqbal, in furtherance of the fraudulent conduct described herein, responded by telling MB that he would send MB a "release form" so that CAIR could look into the matter further. At no time did Iqbal tell MB that Days was not authorized to take legal fees or costs from MB nor did he tell MB that CAIR and Days were not acting as MB's authorized legal counsel.

65.     A few days later, MB received the "release form" by USPS from CAIR-VA (a true and correct copy of which is attached hereto as Exhibit IV). At the top of the page is the name, "Council on American-Islamic Relations". Below

that to the immediate left is "CAIR" in large bold type and "Maryland-Virginia" below that. At the right margin is an address in Bethesda, Maryland (not Herndon, Virginia). Underneath this and centered is the statement in quotation marks: "We promise, We deliver". Underneath this and centered is the purported name-type of the document: "Release Statement".

66.     This "Release Statement" purports to authorize CAIR-VA to act on behalf of the signatory in all matters relating to a claim of discrimination but it adds: "I also understand that CAIR-Maryland & Virginia is NOT a legal services organization and I will hold CAIR-Maryland & Virginia neither financially nor legally liable in respect to any subsequent judicial or administrative proceedings which may result from CAIR's involvement with my complaint."

67.     After receiving this document from CAIR-VA, MB telephoned Days to ask him why he should sign this document since CAIR and Days were in fact acting as his attorneys and that they were representing MB in a federal lawsuit. Days told MB to ignore this form and not to sign it. MB did not sign the form.

68.     By this time, the time period had expired for MB to file his lawsuit against the City of Lynchburg for discrimination following receipt of the Right-to-Sue letter from the EEOC in mid-May 2007.

69.     Sometime soon after February 10, 2008, MB telephoned CAIR-VA to speak to Days. Days was not there but he spoke instead to Iqbal. Iqbal, in furtherance of the conspiracy, informed MB that Days was no longer working at the CAIR-VA offices and that CAIR could not help him with his legal matters

any further. Iqbal did not offer MB to return the monies MB had paid for the filing of the federal litigation, he offered MB no referrals for other legal counsel, and he said nothing of the fraudulent conduct described herein. Iqbal did not tell MB that Days had been fired for fraudulently charging CAIR clients legal fees or that CAIR and Days were in fact never authorized to represent him. MB asked Iqbal to send back his documents, which included a disc with a tape recording with evidence of MB's co-employees ridiculing him and a personal daily journal Days had told MB to keep in order to document any discrimination. Iqbal then caused a package of materials to be sent to MB by USPS in furtherance of the conspiracy to commit fraud.

70.     Upon information and belief, in furtherance of the fraud described herein, on or about February 14, 2008, Iqbal logged onto an Internet-based data base belonging to CAIR, from his offices in Virginia at which time he entered information relating to MB's claims of employment harassment. Iqbal entered that the "Case Status" was closed and did not make any mention of the fraudulent conduct described herein.

71.     Several days later, MB received his documents from CAIR-VA via the USPS but the recordings of the discriminatory statements and the daily journal were missing. MB immediately called CAIR-VA and spoke to the woman he (and other CAIR-VA clients) had known as Sister Iman who worked with Days at CAIR-VA and told her what was missing. She said that Days had the

missing materials. In furtherance of the conspiracy to cover up the Scheme, Sister Iman said nothing else.

72.     Because neither Iqbal nor any one from CAIR had informed MB that Days had been fired, he assumed that Days was just not working at the CAIR-VA offices. MB contacted Days by telephoning Days' cellular telephone. Days informed MB that he was now working at home and pursuing private practice. MB stayed in constant telephone contact with Days during the subsequent months. MB even gave Days $50 for moving expenses as a personal loan.

73.     By August 2008, MB realized that given Days' deteriorating health situation (Days purportedly had a lung disease, diabetes, and other ailments that required him to spend long periods in the hospital), Days could not properly represent him. MB asked Days to recommend another lawyer.

74.     Soon thereafter, on or about September 9, 2008 MB learned of the fraudulent conduct from a researcher unrelated to CAIR. MB called Days to ask him what this was all about and whether it was true that he was not a lawyer and had not actually filed MB's federal lawsuit. Days falsely told MB that it was just a controversy begun by "CAIR haters" and that it was nothing to worry about.

75.     A few days later Athman, CAIR's "national director" of the "civil rights division," telephoned MB in Virginia from the Washington D.C. office of CAIR, explained that she worked at CAIR and informed MB that Days was not

an attorney and that he had committed fraud. MB asked Athman how CAIR could have hired Days in the first place without even investigating whether he was in fact a lawyer and Athman responded that she did not know how or why Days was hired, "but it was a mistake on our part." Athman asked MB how the researcher who had informed MB about the fraudulent conduct described herein had contacted MB. MB instead responded by asking Athman how she had MB's telephone number. Athman informed MB that she had all of the CAIR-VA files and she found his number in those files.

76.    MB told Athman that he had paid Days to file his federal litigation. He asked her what CAIR was offering him by way of compensation. She said CAIR was offering nothing; that she was just calling to inform him that Days was not an attorney. At no time did Athman tell MB that CAIR-VA officials and CAIR officials knew that Days had been fraudulently charging MB legal fees or that neither CAIR nor Days were authorized to act as MB's legal counsel.

77.    MB relied on CAIR and Days to file his administrative and legal complaints in a timely fashion. But for their failures and fraudulent conduct, MB would have filed a timely complaint against the City of Lynchburg for discrimination.

78.    CAIR's conduct as set out above has caused MB direct and consequential monetary damages, including, but not limited to, $200 paid to CAIR for legal costs and damages relating to MB's expired federal claims against the City of Lynchburg for employment discrimination.

79.   In addition, MB has suffered severe emotional distress resulting from CAIR's breach of fiduciary duty owed to him, including anxiety, lack of appetite, inability to sleep, relationship problems with his friends and family, inability to sustain employment resulting from his anxiety, and other manifestations, resulting in damages not yet quantified but no less than $75,000.

80.   At all relevant times, CAIR carried out the fraud and the conspiracy to commit fraud described herein knowingly, willfully, and with the specific intent to defraud MB and further acted knowingly and willfully to conceal the fraud. But for CAIR's concealment of the fraud and the conspiracy to commit a fraud, which CAIR was aware of and had fully joined, Plaintiff could have taken steps to preserve his claims against Enterprise.

81.   All of the acts described above and attributed to Days were carried out in his capacity as an employee and/or agent of CAIR-VA and carried out within and arising from the ordinary course of Days' responsibilities and employment at CAIR-VA and/or within the scope of his authority as the "manager" and "resident" attorney in the CAIR-VA civil rights department.

82.   CAIR-VA was operated and controlled ultimately by CAIR and treated as a wholly owned subsidiary and/or related entity and/or alter ego. Upon information and belief, decisions relating to the opening of CAIR-VA, its funding, the staffing of its executives, promotional materials, its operations, its closing, and the transfer of the client files from CAIR-VA to CAIR's offices in D.C. were ultimately controlled by CAIR.

**Plaintiffs Turner and Lopez**

83.     Turner, on her own behalf and on behalf of Lopez, called CAIR-VA and spoke to Days in early June 2007. She was seeking a divorce from her estranged husband; her companion, Lopez, was seeking help to process his immigration papers for a work visa. During this telephone call and subsequent discussions with Days, Days fraudulently represented to Turner and Lopez that he was a licensed CAIR attorney and that he and CAIR would adequately and professionally represent Turner and Lopez in their legal matters.

84.     Soon thereafter, Turner and Lopez came to the CAIR-VA offices and retained CAIR and Days to represent them in their respective legal matters. Days informed Turner and Lopez that CAIR would require $850 for the immigration matter and $350 for the divorce.

85.     Turner and Lopez returned to the office the following day and informed Sister Iman that they wished to see Days in order to pay him the money owed for the legal work. Sister Iman ushered them to Days' office at CAIR-VA where they paid Days $750 in cash. They arranged and did in fact pay an additional $100 in cash approximately one week later. Days assured them that CAIR would send them a receipt. They never received a receipt.

86.     In addition to the cash, Turner and Lopez performed some chores at Days' home worth $350 and Days agreed that these services would satisfy the retainer amount required for the divorce.  This was in furtherance of the fraudulent conduct described herein.

87.     Over the next several months and through the end of the year 2007, Turner and Lopez contacted Days by telephone but only after, on each occasion, many attempts. At one point, Sister Iman told Turner that Days was in the hospital and that Turner should contact him there. Days would continue to tell Turner that he was working on their legal matters.

88.     In furtherance of the fraudulent conduct described herein, at one point in late 2007, Days sent a letter from CAIR-VA by the USPS and/or by fax to the U.S. Citizenship and Immigration Services in St. Albans, Vermont. In that letter, Days identified Lopez as "my client", explained the facts surrounding Lopez's request for Temporary Protected Status, and asked how to proceed. Days signed his name as "Mr. Morris L. Days, JD, Civil Rights Manager, CAIR Maryland/Virginia."

89.     Finally, sometime soon after February 10, 2008, Turner went to the CAIR-VA offices to inquire as to the status of her legal matters. Days was not at the office but Turner met with and spoke to Iqbal. Iqbal, in furtherance of the conspiracy to cover up the fraudulent conduct described herein, told Turner that Days was no longer at the CAIR-VA offices. Iqbal did not tell Turner that Days' employment with CAIR had been terminated nor did he mention the fraudulent conduct described herein.

90.     Turner then telephoned Days at his residence and Days informed Turner that he was going to be working from his home. Over the next several months, Turner attempted to reach Days on subsequent occasions to determine

the status of her divorce and Lopez's immigration matter. When Turner could not reach Days and after his home telephone number was disconnected, Turner called CAIR-VA and spoke to Sister Iman who told her the CAIR-VA office was in the process of closing.

91.    In or about late May or early June 2008, Turner went to the CAIR-VA office and spoke to Iqbal once again. In furtherance of the fraudulent conduct described herein, Iqbal simply informed Turner that the CAIR-VA office was closing and there was nothing he could do for her.

92.    Soon thereafter, Turner telephoned from Virginia to CAIR in Washington, D.C. to attempt to get some answers about her divorce and Lopez' immigration matter. She spoke to a woman who answered the telephone. Turner informed the woman that she was calling about her legal matters being handled by Days. In furtherance of the fraudulent conduct described herein, the woman told Turner that Days no longer worked for CAIR. Turner then asked, "But what about my case? Days took money from us." The woman informed Turner that she needed to speak to a man, the name of whom Turner does not presently recall. The woman transferred Turner to the man's voice mail at CAIR. Turner left her name and telephone number.

93.    Later that evening, a man telephoned Turner and told her that he was returning her call to CAIR. He told Turner that Days no longer worked at CAIR. Turner informed the CAIR-National representative that Days had taken money for work to be done for her and Lopez. The man, in furtherance of the

fraudulent conduct, responded by saying that "Days was doing private stuff." Turner asked the CAIR representative what she and Lopez were to do. The man responded that Turner's only recourse was to speak with another CAIR official by the name of Osman at telephone number 410-517-4357.

94.    Turner, while in Virginia, immediately telephoned the Maryland telephone number she had been provided and spoke to a man. She again explained that Days had taken money from her and Lopez for various legal matters. The man, in furtherance of the fraudulent conduct, told Turner that Days no longer worked at CAIR and that Days had taken her money for "private" work. This statement was false in that Days represented to Turner and Lopez that he was acting as their legal counsel as a CAIR lawyer and that the fees were being paid to CAIR for these services. The man told Turner that she would have to contact Days directly. Turner replied that she had no way of getting in touch with Days. The CAIR official told Turner that Days was in the Reston, Virginia hospital. The CAIR official said nothing else. He did not offer to return Turner and Lopez's money paid to Days nor did he inform Turner that Days was in fact not a lawyer. No further assistance or information was provided by CAIR to Turner or Lopez. At no time did any CAIR official recommend a lawyer for Turner or Lopez nor did any CAIR official inform Turner or Lopez that they should seek independent legal counsel to protect their interests.

95.   CAIR's conduct as set out above has caused Turner and Lopez direct and consequential monetary damages, including, but not limited to, $1,150 paid to CAIR for legal fees and costs.

96.   In addition, Turner and Lopez have suffered severe emotional distress resulting from CAIR's breach of fiduciary duty owed to them, including anxiety, lack of appetite, inability to sleep, relationship problems with his friends and family, inability to sustain employment resulting from their anxiety, and other manifestations, resulting in damages not yet quantified but no less than $75,000.

97.   At all relevant times, CAIR carried out the fraud and the conspiracy to commit fraud described herein knowingly, willfully, and with the specific intent to defraud Turner and Lopez and further acted knowingly and willfully to conceal the fraud.

98.   All of the acts described above and attributed to Days were carried out in his capacity as an employee and/or agent of CAIR-VA and carried out within and arising from the ordinary course of Days' responsibilities and employment at CAIR-VA and/or within the scope of his authority as the "manager" and "resident" attorney in the CAIR-VA civil rights department.

99.   CAIR-VA was operated and controlled ultimately by CAIR and treated as a wholly owned subsidiary and/or related entity and/or alter ego. Upon information and belief, decisions relating to the opening of CAIR-VA, its funding, the staffing of its executives, promotional materials, its operations, its

closing, and the transfer of the client files from CAIR-VA to CAIR's offices in D.C. were ultimately controlled by CAIR.

### Plaintiff Nur

100.    Nur contacted CAIR-VA in early November 2007 by telephone after suffering illegal employment discrimination at her place of employment, Star-Tek, Inc. She spoke to Sister Iman and explained her complaint. Sister Iman falsely said that CAIR could help her and that Days would contact her.

101.    Days contacted Nur the next day by telephone and explained that he was an attorney working for CAIR. He indicated that CAIR would represent Nur. He asked Nur for information on the names and positions of her superiors at Star-Tek, Inc., including individuals who worked at corporate headquarters in Denver, Colorado. Nur provided Days with the information.

102.    Sometime thereafter, but before November 22, 2007, Days informed Nur that he had called Star Tek, Inc.'s Denver, Colorado offices to speak to a Mr. Andre Johnson who was a senior company official in the office of human resources. In furtherance of the Fraudulent conduct described herein, Days had called Mr. Johnson to inform him that Days was now representing Nur in her employment discrimination matter.

103.    On or about November 22, 2007, Nur attended a meeting at her place of employment to discuss with her supervisors her complaints of discrimination. At this meeting, Star Tek, Inc.'s Mr. Johnson was in attendance. He indicated that he had received a telephone call from Days. At this meeting

Nur explained to the Star Tek, Inc. superiors the nature of the harassment. At this meeting, Mr. Johnson had informed Nur that if Days continued to represent her that the company could no longer communicate directly with her but only through her legal counsel. Nur indicated that she would take the matter under advisement.

104.    Nur immediately telephoned Days at CAIR-VA offices. Nur spoke to Sister Iman, explained the situation, and asked what Days advised her to do. Sister Iman told Nur she would pass the message along to Days. Sister Iman falsely assured Nur that Days would take care of the matter.

105.    A few days later, Brenda Stone, a Star Tek, Inc. human resources official from the corporate offices in Collinsville, Virginia, telephoned Nur to inform her that Star Tek, Inc. would agree to transfer Nur to another department away from the offending co-employees as a way to resolve the matter. Nur told Ms. Stone that she would get back to her with an answer.

106.    Nur immediately telephoned CAIR-VA. Days was not in but Nur spoke to Sister Iman and explained the situation and asked what Days advised her to do. Sister Iman said she would speak with Days.

107.    Soon thereafter, Sister Iman telephoned Nur and told her Days advised her not to accept the transfer as a resolution of the problems at work and that Days would resolve the matter through legal means. Days also telephoned Nur later that day and informed Nur and her husband that she

should not accept the transfer; that she had a very strong case; and that Days would sue Star Tek, Inc. on her behalf.

108.   Relying upon Days' legal advice, Nur refused the transfer offered by her supervisors. Nur was informed by her superiors that as a consequence of her decision, that she would be on unpaid leave until the matter was resolved.

109.   In early December, Nur came to the CAIR-VA office to meet with Days. Days was not in at the time but met instead with Sister Iman. In furtherance of the Fraudulent conduct described herein, Sister Iman falsely informed Nur that Days was in court. Sister Iman assisted Nur in filing employment harassment inquiries with the Virginia Human Rights Council and the EEOC via telephone and facsimile communications.

110.   Soon thereafter, Days contacted Nur's employer by letter through the USPS on Nur's behalf and informed Star Tek, Inc., that CAIR was "a nationally recognized and well-known civil rights organization which handles complaints of religious discrimination"  with a "mission . . . to defend the rights of Muslims in America." The letter suggested that "[i]f necessary, we are available to respond to and resolve the complaints filed by Ms. Abdul-Nur against Star-Tek, Inc." Upon information and belief, soon thereafter, Star Tek, Inc. officials transmitted a copy of the letter by fax or USPS to its corporate headquarters in Colorado.

111.   On January 29, 2008, Nur received a "no action" letter from the EEOC informing her that while the EEOC investigator had concluded that Nur's

charges of discrimination and harassment were not violations of law, Nur had a right to bring formal administrative charges "*within 300 days of the violation*" (emphasis in the original). The letter further states that "If you file a charge, you will be able to pursue the matter further by filing suit in federal district court within 90 days of your receipt of the dismissal."

112.    Nur immediately faxed the EEOC "no action" letter to CAIR-VA. Nur called CAIR-VA and spoke to Sister Iman who confirmed that they received the EEOC "no action" letter and that she would give it to Days, who she said was ill at the time. Sister Iman falsely assured Nur that CAIR would represent her interests and handle the matter.

113.    Nur heard nothing from CAIR or Days until Nur telephoned in early March 2008. Days was not in the office but Sister Iman, in furtherance of the conspiracy to conceal the Fraudulent conduct described herein,  informed Nur that Days was working on her complaint. Soon thereafter, Days telephoned Nur. He informed Nur that he was calling from the hospital and that he had been ill for some time. He assured her that we was going "to sue" Star-Tek, Inc. on her behalf. He informed Nur once again that she had a "very strong case".

114.    It was then clear to Nur that Star-Tek, Inc. was not going to permit her to return to work. She began searching for other employment. Upon information and belief, Star-Tek, Inc. officials gave at least one prospective employer bad references and the employment the prospective employer had tentatively offered her was rescinded. Nur telephoned CAIR-VA and informed

Sister Iman of her fears of being "black-balled" by her employer in April 2008.

Sister Iman falsely assured her that CAIR would look into it. In furtherance of

the Fraudulent conduct described herein and the cover-up, Sister Iman failed to

inform Nur that Days' employment with CAIR had been terminated.

115.    Nur and her family (including her husband and two young children)

were under extreme financial and emotional distress due to the situation in

which she found herself. She had been on a formal leave of absence without pay

from Star Tek, Inc. since November 22, 2007. She had refused the reassignment

as a way to resolve the matter after following Days' advice. She had filed

employment discrimination cases at the state and federal level but they had

been preliminarily rejected. She was now depending on Days and CAIR to

represent her and CAIR representatives were assuring her that CAIR would sue

on her behalf to protect her interests.

116.    In May 2008, Nur and her family were forced to relocate to North

Carolina in order to find employment. Nur and her family were suffering

extreme emotional distress due to the situation. After Nur had called CAIR-VA

and left messages to tell CAIR of her move and to learn of the status of her legal

matters, on May 2, 2008, Sister Iman telephoned from Virginia to Nur in North

Carolina. Nur informed Sister Iman of the new circumstances and to learn of the

status of her lawsuit.

117.    On this occasion Nur spoke to Sister Iman who falsely told her that

Days was no longer working at CAIR but that CAIR was following through on

her complaint. Sister Iman, in furtherance of the fraudulent conduct described herein, informed Nur that CAIR was now preparing an "appeal" from the denial of Nur's complaint and that Nur needed to fax to CAIR an authorization for CAIR to represent Nur in her "appeal". Nur did so that same day from North Carolina.

118.   Nur, while in North Carolina, telephoned and left several messages at the CAIR-VA office over the ensuing weeks. Sister Iman telephoned from Virginia to Nur in North Carolina in July 2008 and put some CAIR-VA official on the telephone who falsely said he was reviewing the case and that he would keep Nur informed of any developments. He assured Nur that CAIR would vigorously represent her interests. In fact, no CAIR attorney or other staff member was representing Nur's interests. In furtherance of the conspiracy to conceal the fraudulent conduct described herein, neither Sister Iman nor this other CAIR-VA official mentioned to Nur that neither CAIR nor Days were authorized to act as Nur's lawyer and that she had been defrauded to believe that CAIR had filed or was planning to file an administrative appeal or lawsuit on her behalf.

119.   Later that same month, Sister Iman, in furtherance of the conspiracy to conceal the fraudulent conduct, called Nur in North Carolina to inform her that the CAIR-VA office was now permanently closed down and that her files had been sent to CAIR in Washington, D.C., which would be handling her case.

120.    Nur has heard nothing from CAIR or any official from CAIR since that last telephone call from Sister Iman. In fact, CAIR has filed neither an administrative appeal nor a lawsuit on Nur's behalf. Nur did not discover that she had been defrauded until she was contacted by an independent researcher looking into the fraudulent conduct described herein in September 2008, more than 300 days after the illegal discrimination she suffered at her employment at Star Tek, Inc.

121. Nur relied on CAIR and Days to file her administrative and legal complaints in a timely fashion. But for their failures and fraudulent conduct, Nur would have filed a timely complaint with the EEOC against Star Tek, Inc. for illegal discrimination.

122. CAIR's conduct as set out above has caused Nur direct and consequential monetary damages, including, but not limited to, $7,425 in lost wages and approximately $1,500 for moving expenses to relocate to North Carolina to find alternative employment, and damages relating to Nur's expired federal claims against Star Tek, Inc. for employment discrimination.

123. In addition, Nur has suffered severe emotional distress resulting from CAIR's breach of fiduciary duty owed to her, including anxiety, lack of appetite, inability to sleep, relationship problems with his friends and family, inability to sustain employment resulting from her anxiety, and other manifestations, resulting in damages not yet quantified but no less than $75,000.

124.   At all relevant times, CAIR carried out the fraud and the conspiracy to commit fraud described herein knowingly, willfully, and with the specific intent to defraud Nur and further acted knowingly and willfully to conceal the fraud. But for CAIR's concealment of the fraud and the conspiracy to commit a fraud, which CAIR was aware of and had fully joined, Nur could have taken steps to preserve her claims against Star Tek, Inc.

125.   All of the acts described above and attributed to Days were carried out in his capacity as an employee and/or agent of CAIR-VA and carried out within and arising from the ordinary course of Days' responsibilities and employment at CAIR-VA and/or within the scope of his authority as the "manager" and "resident" attorney in the CAIR-VA civil rights department.

126.   CAIR-VA was operated and controlled ultimately by CAIR and treated as a wholly owned subsidiary and/or related entity and/or alter ego. Upon information and belief, decisions relating to the opening of CAIR-VA, its funding, the staffing of its executives, promotional materials, its operations, its closing, and the transfer of the client files from CAIR-VA to CAIR's offices in D.C. were ultimately controlled by CAIR.

## CAUSES OF ACTION

### COUNT ONE—VIOLATIONS OF DCCPPA: D.C. CODE § 28-3901 ET SEQ.

127.   Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

128.   This count is brought by Plaintiffs against Defendant CAIR alleging a cause of action under the DCCPPA, D.C. Code § 28-3905(k)(1). Specifically, Plaintiffs allege that they have been damaged as a result of the fraudulent acts as set forth above and that this Count One arises from the purchase of, transfer of, and/or providing information about the offering of consumer services in the ordinary course of business as those terms are defined by the DCCPPA.

129.   Plaintiffs are "persons" within the meaning of D.C. Code § 28-3901(a)(1).

130.   At all relevant times, CAIR operated as a "person" within the meaning of D.C. Code § 28-3901(a)(1).

131.   At all relevant times, CAIR-VA and CAIR represented to the public and to Plaintiff that CAIR was providing legal services as a PILF in the "ordinary course of business" as that term is generally used in the DCCPPA. Plaintiff retained CAIR to provide legal services and paid for legal costs incurred by CAIR. But, in fact, CAIR was not a PILF and was not authorized by law to provide legal services as a PILF.

132.   CAIR conducted trade practices in violation of the law of the District of Columbia. Specifically, defendants violated D.C. Code §§ 28-3904(a), (b), (d), (e), (f), (g), (h), (i), (m), (s), (u), and (v).

133.   As a result of CAIR's violation of the DCCPPA, Plaintiff has suffered financial damages and other damages arising from the conduct described herein.

134.   As a result of its misconduct, the Defendant CAIR is liable to Plaintiff for his losses in an amount to be determined at trial.

135.   Pursuant to D.C. § 28-3905(k)(1)(A), Plaintiff is entitled to recover threefold his damages, or $1,500 per violation, whichever is greater, from the Defendant.

136.   Pursuant to D.C. § 28-3905(k)(1)(B), Plaintiffs are entitled to recover reasonable attorney's fees from the Defendant.

137.   Pursuant to D.C. § 28-3905(k)(1)(C), Plaintiffs are entitled to recover punitive damages from the Defendant insofar as the fraudulent acts set forth above amounted to egregious and intentional and/or reckless conduct carried out by the Defendant as a fiduciary against Plaintiffs who were in a far inferior position of knowledge and experience and who entrusted their most important legal matters to the Defendant under false pretenses.

138.   Pursuant to D.C. § 28-3905(k)(1)(D), Plaintiffs are entitled to seek an injunction against the use of the unlawful trade practices set forth above.

139.   Pursuant to D.C. § 28-3905(k)(1)(E), Plaintiffs are entitled to such other additional relief as may be necessary to restore to the Plaintiffs' money or property, which may have been acquired by means of the unlawful trade practices set forth above.

140.   Pursuant to D.C. § 28-3905(k)(1)(F), Plaintiffs are entitled to any other relief which the Court deems proper.

## COUNT TWO—VIOLATIONS OF VCPA: VA. CODE ANN. § 59.1-196 ET SEQ.

141.   Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

142.   This count is brought by Plaintiffs against Defendant CAIR alleging a cause of action under the VCPA, Va. Code Ann § 59.1-204. Specifically, Plaintiffs allege that they have been damaged as a result of the fraudulent acts as set forth above and that this Count Two arises from the advertisement, sale, or offering for sale of services to be used primarily for personal, family, or household purposes as those terms are defined by the VCPA.

143.   At all relevant times, the Defendant was a "person" within the meaning of Va. Code Ann. § 59.1-198.

144.   Plaintiffs are "persons" within the meaning of Va. Code Ann. § 59.1-198.

145.   At all relevant times, CAIR operated as a "supplier" within the meaning of Va. Code Ann. § 59.1-198.

146.   At all relevant times, Defendant CAIR represented to the public and purportedly conducted its affairs directly and through CAIR-VA as a PILF which advertised, offered for sale, and in fact purportedly provided legal services to be used primarily for personal, family, and/or household purposes as those terms are defined and used in the VCPA. In fact, however, neither CAIR nor CAIR-VA provided such legal services.

147.    At all relevant times, Defendant CAIR conducted consumer transactions as that term is defined in Va. Code Ann. in § 59.1-198.

148.    At all relevant times, Defendant CAIR, engaged in unlawful fraudulent acts and/or practices in violation of the VCPA. Specifically, Defendant violated §§ 59.1-200(A)(1)-(3), (5)-(6), (8), and (14).

149.    As a result of Defendant CAIR's violation of the VCPA, Plaintiff has suffered financial damages and other damages arising from the fraudulent conduct set forth herein.

150.    As a result of its misconduct, Defendant CAIR is liable to Plaintiffs for their respective losses in an amount to be determined at trial.

151.    Pursuant to Va. Code Ann. § 59.1-204(A), because the fraudulent acts set forth above were carried out by the Defendant willfully, Plaintiffs are entitled to recover threefold their respective damages, or $1,000 per violation, whichever is greater from Defendant CAIR.

152.    Pursuant to Va. Code Ann. § 59.1-204(B), Plaintiffs are entitled to recover reasonable attorneys' fees and court costs from Defendant CAIR.

### COUNT THREE—COMMON LAW FRAUD AND CONSPIRACY TO COMMIT FRAUD

153.    Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

154.    This count is brought by Plaintiffs against Defendant CAIR alleging a cause of action for common law actual fraud, constructive fraud, conspiracy to

commit actual fraud and/or conspiracy to commit constructive fraud under the common law of the Commonwealth of Virginia and/or the District of Columbia.

155.    As set forth above, Defendant CAIR damaged Plaintiffs through its fraudulent acts.

156.    In addition, Defendant CAIR conspired with Days by entering into an agreement with Days to engage in the fraudulent conduct described herein above and because Defendant CAIR provided substantial assistance in carrying out the fraudulent conspiracy.

157.    Defendant CAIR is liable for all of the damages caused by its own fraudulent acts and, as a result of the conspiracy to commit fraud, for all of the damages caused to Plaintiffs by any member of the conspiracy.

158.    Defendant CAIR is liable for punitive damages arising from its fraudulent acts insofar as its conduct in furtherance of the fraudulent acts as set forth above amounted to egregious and intentional and/or reckless conduct carried out by the Defendant CAIR and other members of the conspiracy to commit fraud against Plaintiffs. Defendant CAIR was a fiduciary to each of the Plaintiffs in that Plaintiffs had entrusted their confidential legal affairs to CAIR and the Plaintiffs were in a far inferior position of knowledge and experience relative to CAIR.

## COUNT FOUR—BREACH OF FIDUCIARY DUTIES

159.    Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

160.   This count is brought by Plaintiffs against Defendant CAIR alleging a cause of action for breach of fiduciary duties under the common law of the Commonwealth of Virginia and/or the District of Columbia.

161.   As set forth above, Defendant CAIR purported to act as a nationwide PILF and was in the position of a fiduciary to Plaintiffs insofar as Plaintiffs, who were each in a far inferior position of knowledge and experience to CAIR, accepted CAIR's offer to provide legal services in a matter of great importance to Plaintiffs. As such, Plaintiffs reposed trust and confidence in Defendant CAIR and CAIR agreed with each of the Plaintiffs to act as a fiduciary.

162.   As set forth above, Defendant CAIR's wrongful conduct arising out of the fraud set forth herein breached the duty of care owed to Plaintiffs. Specifically, Defendant CAIR's wrongful conduct constituted the unauthorized practice of law and criminal fraud.

163.   As set forth above, Defendant CAIR damaged Plaintiffs through its breach of fiduciary duties.

164.   As set forth above, Defendant CAIR conspired with and aided and abetted others to breach its fiduciary duties insofar as it knew of the fraudulent conduct described herein, it agreed to join the conspiracy to commit fraud, and it provided substantial assistance in carrying out fraud.

165.   Defendant CAIR is liable for all of the damages caused by the breach of fiduciary duties owed to Plaintiffs.

166.   Defendant CAIR is liable for punitive damages arising from its wrongful acts constituting breach of fiduciary duties insofar as its conduct in furtherance of its wrongful acts as set forth above amounted to egregious and intentional and/or reckless conduct carried out by Defendant CAIR as a fiduciary against Plaintiffs who were in a far inferior position of knowledge and experience and who entrusted their most important legal matters to Defendant CAIR under false pretenses.

### COUNT FIVE—INFLICTION OF EMOTIONAL DISTRESS

167.   Plaintiffs repeat and reallege all of the allegations above as if fully alleged herein.

168.   This count is brought by Plaintiffs against Defendant CAIR alleging a cause of action for intentional infliction of emotional distress under the common law of the Commonwealth of Virginia and/or the District of Columbia.

169.   As set forth above, the wrongful conduct of Defendant CAIR giving rise to the fraud described herein was (a) intentional and/or reckless and (b) outrageous and intolerable.

170.   At all relevant times, Plaintiffs had entrusted sensitive, personal, and potentially valuable legal matters to the Defendant CAIR, which had held itself out to Plaintiffs as a PILF and as fiduciary to Plaintiffs. As set forth above, Plaintiffs were defrauded by Defendant CAIR.

171.   As a direct result of the Defendant CAIR's outrageous and intolerable wrongful conduct described above, Plaintiffs have suffered severe emotional distress and has been damaged thereby.

172.   Defendant CAIR is liable for punitive damages arising from its wrongful acts constituting intentional infliction of emotional distress insofar as its conduct in furtherance of the wrongful acts as set forth above amounted to egregious and intentional and/or reckless conduct carried out by Defendant CAIR as a fiduciary against Plaintiffs who were in a far inferior position of knowledge and experience and who entrusted their most important legal matters to Defendant CAIR under false pretenses.

### PRAYERS FOR RELIEF

173.   **WHEREFORE**, Plaintiffs pray for judgment and relief as follows, where applicable:

174.   Awarding compensatory damages in favor of Plaintiffs against Defendant for the damages sustained as a result of the wrongful conduct alleged and as will be established through discovery and/or at trial, together with interest thereon.

175.   Awarding treble damages, attorneys' fees, and costs in favor of Plaintiffs against Defendant for the damages sustained in violation of the DCCPPA and the VCPA as alleged herein.

176.   Awarding punitive damages to Plaintiffs against the Defendant for the egregiously wrongful conduct alleged herein.

177.   Granting declaratory and/or injunctive relief as appropriate.

178.   Imposing a constructive trust as appropriate.

179.   Awarding attorneys fees and legal costs.

180.   And, such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

181.   All plaintiffs hereby demand a jury trial.

Dated: January __, 2010.

Respectfully submitted,

LAW OFFICES OF DAVID YERUSHALMI, P.C.

By: _____
         David Yerushalmi

David Yerushalmi
District of Columbia Bar No. 978179
LAW OFFICES OF DAVID YERUSHALMI
P.O.B. 6358
Chandler, Arizona 85246
david.yerushalmi@verizon.net
Tel: (646) 262-0500
Fax: (801) 760-3901